UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF MISSOURI

.

UNITED STATES OF AMERICA

               Plaintiff,                        20-06007-03-CR-SJ-DGK

v.

RYAN NEAL MONTGOMERY

               Defendant.

## I. SUMMARY

On July 29, 2024, Mr. Ryan Neal Montgomery is to be sentenced following his plea to one count of Conspiracy to Advertise Child Pornography, in violation of 18 U.S.C. § 2251(d) and (e). Congress has determined that an appropriate sentence for this offense ranges from fifteen to thirty years in prison. The Presentence Investigation Report (PSR) scored Mr. Montgomery's advisory guideline range as 292 to 365 months, based on a total offense level of 40 and a criminal history category I. Because the statutory maximum is 30 years, the guideline range becomes 360 months. Counsel for Mr. Montgomery submits that the correct scoring of the guideline range results in a total offense level of 32 and criminal history category of I, or 121-151. Because the statutory minimum is fifteen years, the guideline range becomes fifteen years, or 180 months. Mr. Montgomery respectfully submits that it a sentence of fifteen years of imprisonment is sufficient

but not greater than necessary to accomplish the goals of sentencing, when the sentencing factors set forth in 18 U.S.C. § 3553(a) are fully considered.

## II. Mr. Montgomery's Objections to the Presentence Investigation Report

### A. Five-Level Enhancement Pursuant to U.S.S.G. § 2G2.2(b)(3)(B) for Distribution in Exchange for Valuable Consideration is Not Factually Supported by a Preponderance of the Evidence

Mr. Montgomery renews his objection to the five-level enhancement for distribution in exchange for valuable consideration pursuant to U.S.S.G. § 2G2.2(b)(3)(B). (PSR, R. 235, p. 19). The government asserts that the five-level enhancement pursuant to U.S.S.G. § 2G2.2(b)(3)(B) applies because Mr. Montgomery received "valuable consideration" in the form of "greater status on Website A," in exchange for his distribution on the website. (PSR, R. 235, p. 5, para. 3). Because the government has not proved by a preponderance that the five-level enhancement should apply under U.S.S.G. § 2G2.2(b)(3)(B), Mr. Montgomery respectfully requests the Court decline to apply it.

The enhancement is to be applied where "the defendant agreed to an exchange with another person under which the defendant knowingly distributed to that other person for the specific purpose of obtaining something valuable from that other person, such as other pornographic material, preferential access to child pornographic material, or access to a child." U.S.S.G. § 2G2.2 cmt n.1. The government bears the burden of proving by a preponderance of the evidence that an enhancement applies. *United States v. Ford*, 987 F.3d 1210, 1214 (8th Cir. 2021). Evidence a sentencing court can rely on in making a factual determination necessary for a guidelines enhancement includes the "unobjected-to portions of the PSR," the written factual basis of a plea agreement, and evidence presented at an evidentiary hearing. *United States v. Poor Bear*, 359 F.3d 1038, 1042 (8th Cir. 2004). The knowing use of peer-to-peer sharing

software alone does not generally satisfy the requirements for a five-level enhancement under this section. *United States v. Hansen*, 859 F.3d 576, 577-578 (8th Cir. 2017); see also *United States v. Mayokok*, 854 F.3d 987, 991 (8th Cir. 2017) (rejecting blanket application of the enhancement simply because a defendant uses a file-sharing program).

While the government contends that Mr. Montgomery's "higher status" on Website A was the "valuable consideration" provided in exchange for Mr. Montgomery's distribution, it has not presented evidence that such "higher status" qualifies as "valuable consideration." Mr. Montgomery's status as a chat moderator did not afford him greater access to material, waive or reduce any membership or use fees, or otherwise benefit him. Mr. Montgomery's status moderator would only allow to remind people of the rules of the chat room, advise them that their chat name did not meet the requirements, and temporarily remove visitors from the chat room (this removal was truly temporary as a visitor could simply immediately log back in). Put simply, "status" as a moderator was neither objectively nor subjectively valuable; having no value, this "higher status" could not be the "valuable consideration in exchange for distribution" required for this enhancement.

Furthermore, the government's own contention about Mr. Montgomery having received valuable consideration for his higher status is undermined by the statements of fact contained in the Plea Agreement. Specifically, while the government indicates that Mr. Montgomery was involved with Website A for "at least approximately a year, ending in July 2020," the first and only instance the government cites wherein Mr. Montgomery "advertised and shared child pornography over Website A" was on June 20, 2020. (Plea Agreement, R. 223, p. 3). Thus, the factual record reflects that virtually the entirety of Mr. Montgomery's involvement with Website A had occurred before he ever "advertised and shared child pornography over Website A," yet he

had already been accorded the "higher status" the government claims was an integral part of the exchange. This makes no sense. Mr. Montgomery thus disputes as a factual matter that his higher status was valuable consideration, and disputes that he distributed material in exchange for that status. The government did not assert that there was any other valuable consideration received by Mr. Montgomery in exchange for his distribution.

Because the government's assertion that Mr. Montgomery's "higher status" was valuable consideration exchanged for his distribution of child pornography is not supported by anything in the record, and because it has not presented evidence that Mr. Montgomery received any *other* valuable consideration in exchange for his distribution, the Court should decline to apply this five-level enhancement. *Mayokok* at 991 (remanding for resentencing after district court applied § 2G2.2(b)(3)(B) enhancement because the assertion that the defendant had distributed with the expectation of receiving valuable consideration in return "was not sufficiently supported in the record.").

Even is this court should overrule the Defendant's objection on the grounds that the defendant's position as moderator does constitute pecuniary gain, the Defense submits that these same arguments support a variance from this guideline under the courts authority to vary from the sentencing guidelines under *Gall v. United States*, 128 S. Ct. 586, 602 (2007).

**B. Three-Level Enhancement Pursuant to U.S.S.G. §3B1.1(b) for Manager or Supervisor Role is Not Factually Supported by a Preponderance of the Evidence**

Mr. Montgomery renews his objection to the three-level enhancement for a manager or supervisor role pursuant to U.S.S.G. § 3B1.1(b) (PSR, R. 235, p. 19). The government asserts that the three-level enhancement pursuant to U.S.S.G. § 3B1.1(b) applies because Mr. Montgomery was a "manager and supervisor of criminal activity that involved five or more participants or was otherwise extensive." (PSR, R. 235, p. 5, para. 3). Because the government

has not proved by a preponderance that this three-level enhancement should apply, Mr. Montgomery respectfully requests the Court decline to apply any enhancement under this section.

Factors a sentencing court should consider "include the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. 3B1.1, cmt. n. 4. "The key factors in determining management or supervisory authority are control over participants and organization of the criminal activity." *United States v. Valencia*, 829 F.3d 1007, 1012 (8th Cir. 2016). Indeed, while the Eighth Circuit has "defined the terms 'manager' and 'supervisor' quite liberally," it has also required that the defendant have actually managed or supervised at least one other participant in the criminal conspiracy. *United States v. Lopez,* 431 F.3d 313, 317-318 (8th Cir. 2005); see also *United States v. Zimmer*, 299 F.3d 710, 724 (8th Cir. 2002).

Mr. Montgomery's role within Site A was nothing more than a hall monitor. His role as moderator was to notify members who came the chat site of what the rules of the chat site were. The extent of his "power" was the ability to remove someone from the chat who did not follow the rules. Someone who was removed from the chat could simply rely log on again immediately after being kicked off the chat. Mr. Montgomery could not ban people from the site or change the rules of the site. He could not make decisions on how the site was run nor did he supervise anyone within the site. The pecking order within Site A was guest, registered guest (guest with a log in). member, moderator, super moderator, system administrator. Mr. Montgomery's role within Webiste A was akin to an employee or clerk at a store. He could inform people of the

rules, ask them to follow the rules, and kick them out of the chat. But he has no supervisory authority over anyone running Website A.

The government has not presented evidence showing that Mr. Montgomery had any supervisory or management authority over any other participant in the criminal conspiracy. While the Plea Agreement includes factual assertions as to Mr. Montgomery's authority to promulgate, clarify and enforce the rules, these activities or authorities were not exercised vis à vis other participants in the enterprise but rather over users of Website A that were specifically *not* participants in the enterprise. Mr. Montgomery cannot find any case law suggesting that every user of a website such as Website A is considered a participant in the criminal enterprise for purposes of this guideline enhancement; as such, Mr. Montgomery avers that the government has failed to present proof that he supervised or managed even one other participant and that therefore the Court cannot apply any aggravating role enhancement under §3B1.1.

Even is this court should overrule the Defendant's objection on the grounds that the Defendant's role technically meets the definition of manager, the Defense submits that these same arguments support a variance from this guideline under the courts authority to vary from the sentencing guidelines under *Gall v. United States*, 128 S. Ct. 586, 602 (2007) because the three level enhancement overstates the extend of Mr. Montgomery's power or role within the conspiracy.

### III. APPLICATION OF 18 U.S.C. § 3553(A) FACTORS

When sentencing a defendant who has been found guilty of a crime, courts must comply with the basic aims of sentencing set forth in 18 U.S.C. § 3553(a). *Rita v. United States*, 127 S. Ct. 2456, 2463 (2007). The basic aim of sentencing is to "impose a sentence sufficient, but not greater than necessary" to accomplish the goals of sentencing. 18 U.S.C. § 3553(a); *United States v.*

*Kimbrough*, 128 S. Ct. 558, 570 (2007). The goals of sentencing are "to reflect the seriousness of the offense," "to promote respect for the law," "to provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," "to protect the public from further crimes of the defendant," and "to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(A)-(D); *Kimbrough*, 128 S. Ct. at 570. The lowest possible sentence that is minimally sufficient to meet those goals must be imposed. 18 U.S.C. § 3553(a).

In fashioning a sentence, the Court is to consider the nature and circumstances of the offense and the history and characteristics of the defendant; the kinds of sentences available; the advisory guideline range; the need to avoid unwarranted sentencing disparities; the need for restitution. Additionally, the sentence must reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, provide adequate deterrence, protect the public from future crimes, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a).

Courts are no longer required to impose a sentence within the range recommended by the United States Sentencing Guidelines. *United States v. Booker,* 543 U.S. 220, 125 S. Ct. 738 (2005). The Guidelines, "formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. United States*, 128 S. Ct. 558, 564 (2007) (internal quotations omitted); *Gall v. United States*, 128 S. Ct. 586, 602 (2007) (same). Courts "may vary [from the Guideline ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 128 S. Ct. at 570.

When a Court disagrees with the Guidelines, the courts of appeals may not "grant greater factfinding leeway to [the Commission] than to [the] district judge." *Rita v. United States*, 127 S.

Ct. 2456, 2465, 2468 (2007).  The Guidelines deserve some level of deference from the Court when they are based on (1) empirical evidence of pre-guideline sentencing practice and (2) periodic review/revision in light of judicial decisions, sentencing data, and comments from participants and experts in the field.  *Rita,* 127 S. Ct. at 2464-65.  However, as the Supreme Court noted, "not all of the Guidelines are tied this empirical evidence." *Gall,* 128 S. Ct. at 594 n.2.  When a guideline is not the product of "empirical data and national experience," it is not an abuse of discretion to conclude that it fails to achieve the purposes of sentencing, as set forth in 18 U.S.C. § 3553(a), even in the average case.  *Kimbrough*, 128 S. Ct. at 575.

Because the "Guidelines are not the only consideration," the Court, "after giving both parties an opportunity to argue for whatever sentence they deem appropriate," "should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by the party."  *Id*. at 570.  The Court must "impose a sentence sufficient, but not greater than necessary" to achieve the goals of sentencing.  *Id*.  In doing so, the Court must independently evaluate the appropriate sentence in light of § 3553(a), consider arguments that the guidelines should not apply on general policy grounds or case specific grounds, but "may not presume that the Guidelines range is reasonable." *Rita, 127 S. Ct. at 2463, 2465, 2467-68*; *Gall*, 128 S. Ct. at 596-97.

A district court's rationale for granting a variance does not need to be extraordinary, only substantively reasonable. *United States v. Davis*, 20 F.4th 1217, 1221 (8th Cir. 2021).  "We may not require 'extraordinary' circumstances to justify a sentence outside the Guidelines." *United States v. Feemster*, 572 F.3d 455, 462 (8th Cir. 2009) (quoting *Gall*, at 595).

In Mr. Montgomery's case, a downward variance is warranted because (a) of Mr. Montgomery's history and characteristics, (b) the guidelines result in a sentence that is too harsh

or "greater than necessary" to achieve the goals of sentencing because the child pornography guidelines are not based on any empirical evidence.

## A. The Nature and Circumstances of the Offense

Mr. Montgomery pled guilty to Conspiracy to Advertise Child Pornography, in violation of 18 U.S.C. § 2251(d) and (e). Mr. Montgomery's involvement in this offense lasted for approximately one year, ending in July 2020, and consisted of his presence on and participation in Website A, a website that advertised and distributed child pornography. It is important to note that unlike his co-defendants, there is no evidence or allegations that Mr. Montgomery ever engaged in actual inappropriate sexual, physical, or verbal contact with a minor of any sort. Mr. Montgomery was essentially a collector of child pornography. While Mr. Montgomery did post some child sexually abusive material, his distribution consisted of very few images and occurred only after he was required to do so to prove that he was not law enforcement or be threatened with exposure. Furthermore, the images or links to images that were posted were of a less hardcore nature than the images and links posted by other members of the site.[1] This does not in any way suggest that he was not a willing participant in the site, it is only brought up to put his distribution activities in the proper context in comparison to other members of Website A.

When Mr. Montgomery's activities were discovered by law enforcement and he was confronted by law enforcement on October 28, 2020, Mr. Montgomery admitted his wrongdoing and agreed to cooperate with the government by allowing them to utilize his accounts. Ultimately,

---

[1] During Special Agent Backlund's interview with Mr. Montgomery following the raid, Agent Backlund made the following comments to Mr. Montgomery while interviewing him: "I also know this, and here's the good news, that I've never seen any real hardcore postings. I see mostly artistic kind of LS model type stuff... It's artistic"

*\*\*\**

"We don't have a lot of images or videos of children being sexually assaulted... "

*\*\*\**

"And I have no... I'm using that for an analogy. I have no information that you've ever produced. I have no information that you've ever hurt a kid."

the FBI never utilized Ryan's services, but the fact remains that Ryan offered to assist on the date of the raid after he submitted to questioning. The visit from the FBI served as a wakeup call. Mr. Montgomery cooperated with the FBI immediately following the raid. Furthermore, he remained at his home and made no attempt to flee between the dates of the raid and his arrest in this matter. Mr. Montgomery has accepted responsibility for his actions. Mr. Montgomery has not been accused of touching a child inappropriately.

## B. The History and Characteristics of Mr. Montgomery Warrant a Downward Variance

Mr. Montgomery, at 44 years of age, has never been in trouble with the law prior to this case. His clean criminal history supports a downward variance even though the advisory guideline range has already "counted" his lack of criminal history. "[F]actors that have already been taken into account in calculating the advisory guideline range, such as a defendant's lack of criminal history, can nevertheless form the basis of a variance." *United States v. Chase*, 560 F.3d 828, 831 (8th Cir. 2009). While a lack of criminal history is *de facto* taken into account on some level by the guidelines, there is a significant difference between a person with a criminal history category of I, and a person, such as Mr. Montgomery, with no prior arrests or convictions at all.

To start with, 28 U.S.C. § 994(j), charges the Sentencing Commission with "ensur[ing] that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense."

In *United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009), the Ninth Circuit found that a district court's *sua sponte* variance to probation in a child pornography case with guidelines of 41- 51 months was not unreasonable, in part, because the criminal history category of I "did not fully account for his complete lack of criminal history" since a defendant with minor criminal

history may still fall in criminal history category I.

Likewise, in *United States v. Huckins*, 529 F.3d 1312 (10th Cir. 2008), the Tenth Circuit upheld a variance of 24 months in a child pornography case with guidelines of 78-97 months. The court reasoned that this was the defendant's first conviction, and rejected the Government's argument that the guidelines already considered this by placing the defendant in criminal history category I:

> . . . although the Guidelines discourage granting a downward departure based upon criminal history when the defendant has been placed in a criminal history category of I… this is not a departure case, it is a variance case… and, after *Gall* and *Kimbrough*, a factor's disfavor by the Guidelines no longer excludes it from consideration under § 3553(a)… Therefore, a district court may weigh a defendant's lack of a criminal record, even when the defendant has been placed into a criminal history category of I, in its § 3553(a) analysis.

*United States v. Huckins*, 529 F.3d 1312, 1318-1319 (10th Cir. 2008).

In fact, the Sentencing Commission's own research suggests that proper application of 3353(a) in the case of a true first offender now strongly supports a below-guideline variance because of 3553(a)(2)(C) and 2552(a)(6). As Professor Berman points out in his sentencing blog, these factors are only properly acknowledged if and when a true first offender gets a lower sentence than the advisory range suggested for all the other persons with some criminal history that are lumped into criminal history category I. *See* (See Sentencing Commission's report, Recidivism and the "First Offender" (May 2004), at www.ussc.gov/publicat/Recidivism_FirstOffender.pdf. He notes that:

> The analysis [of empirical data on re-offending] delineates recidivism risk for offenders with minimal prior criminal history and shows that the risk is lowest for offenders with the least experience in the criminal justice system. Offenders with zero criminal history points have lower recidivism rates than offenders with one or more criminal history points. Even among offenders with zero criminal history points, offenders who have never been arrested have the lowest recidivism risk of all.

Because the guidelines fail to fully take into account the import of Mr. Montgomery's clean criminal history, a downward variance from the advisory guideline range is warranted.

Mr. Montgomery's mental health history and condition also support a downward variance in this case. His ability to conform his conduct to the expectations of this Court and the law during his pretrial release has occurred in the face of noteworthy mental health struggles. As noted in the PSIR, Mr. Montgomery underwent a competency evaluation which included exploration of his history of depression and present perceptions that he can communicate directly with God. While the Court concluded, based on the recommendation contained in the evaluation, that Mr. Montgomery was competent to stand trial because he understood the nature of the proceedings against him, it is clear that Mr. Montgomery was, and continues to be, suffering with significant mental health issues that impact his critical thinking and decision-making processes. "Serious, untreated mental health issues" can form the basis for a downward variance. *United States v. Twine*, 66 F.4th 736, 738 (8th Cir. 2023). See also *United States v. Hubbs*, 18 F.4th 570, 572 (8th Cir. 2021) (acknowledging mental health issues as a "mitigating factor[]" that can be used to support a variance).

Numerous family members and friends have submitted character letters on behalf of Mr. Montgomery. None of these friends of family members make any excuses for Mr. Montgomery's behavior. However, they all describe Mr. Montgomery as a gentle, caring, and generous son, brother, and friend. However, they also describe a young man who has faced his share of challenges throughout his life. Ryan's father, a clinical psychologist, believes that Ryan exhibits symptoms of autism spectrum disorder.

**C. The Guidelines Result In A Sentence That Is Too Harsh Or "Greater Than Necessary" To Achieve The Goals Of Sentencing Because The Child Pornography Guidelines Are Not Based On Any Empirical Evidence**

While the Guidelines as a whole are generally "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," the Supreme Court has recognized that specific portions of the Guidelines are not empirically derived. *Gall v. United States*, 552 U.S. 38, 46, 128 S. Ct. 586, 594 (2007). "For example, the Sentencing Commission departed from the empirical approach when setting the Guidelines range for drug offenses and chose instead to key the Guidelines to the statutory mandatory minimum sentences that Congress established for such crimes." *Gall*, 552 U.S. at 46 n.2. Because the drug offense guidelines did not take account of empirical data and national experience, "it would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough v. United States*, 552 U.S. 85, 110, 128 S. Ct. 558, 575 (2007).

Like the crack cocaine guidelines, the child pornography guidelines are not based on empirical evidence. *United States v. McNerney*, 636 F.3d 772 (6th Cir. 2011) ("the Commission did not use this empirical approach in formulating the Guidelines for child pornography.") (quoting *United States v. Dorvee,* 604 F.3d 84,95 (2d Cir. 2010)). Consequently, the Supreme Court's reasoning in *Kimbrough* has been applied to cases involving child pornography. See *United States v. O'Connor*, 567 F.3d 395, 398, n.4 (8th Cir. 2009) (assuming without deciding that *Kimbrough's* holding extends beyond the crack-cocaine Guidelines).

Applying the black letter of U.S.S.G. §2G2.2, The PSR calculates defendant's total offense level to be 40 and his criminal history category to be I for an advisory guideline sentencing range of 292 to 365 months, D Zone. While the guideline calculation and resulting advisory sentencing range may be technically accurate (pending this Court's resolution of Defendant's guideline

objections), they are not mandatory or even presumptively correct. *United States v. Booker*, 543 U.S. 220, 246-58 (2005); *Gall v. United States*, 552 U.S. 38, 49, 51 (2007); *Nelson v. United States*, 555 U.S. 350, 352 (2009). A key component of Supreme Court law, designed to ensure that the guidelines are truly advisory and constitutional, is the authority of this Court to disagree with a guideline as a matter of policy. Because "the Guidelines are now advisory . . . , as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101-02 (2007) (internal punctuation omitted) (citing *Rita v. United States*, 551 U.S. 338, 351 (2007) (district courts may find that the "Guidelines sentence itself fails properly to reflect §3553(a) considerations"). In fact, sentencing courts are free to disregard a sentencing guideline in whole or in part if they disagree with the policy behind it. *United States v. Brooks*, 628 F.3d 791, 799 (6th Cir. 2011).

Mr. Montgomery incorporates by reference the arguments set forth in two articles authored by Troy Stabenow, an Assistant Federal Public Defender in the Western District of Missouri: *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines*[2] and *A Method for Careful Study: A Proposal for Reforming the Child Pornography Guidelines.*[3] Mr. Stabenow's overarching argument is that "changes to the child pornography guidelines are not the product of an empirically demonstrated need for consistently tougher sentencing," but rather "are largely the consequence of numerous morality earmarks,

---

[2]Available at https://www.ussc.gov/sites/default/files/pdf/training/annual-national-training-seminar/2016/report_stabenow.pdf. (Stabenow, T. (2009). Deconstructing the Myth of Careful Study: A Proposal for Reforming the Child Pornography Guidelines.)

[3] Available at https://doi.org/10.1525/fsr.2011.24.2.108 (Stabenow, T. (2011). A Method for Careful Study: A Proposal for Reforming the Child Pornography Guidelines. *Federal Sentencing Reporter*, *24*(2), 108–136.)

slipped into larger bills over the last fifteen years, often without notice, debate, or empirical study of any kind;" the guidelines thus result in recommended guidelines that are neither tailored to nor appropriate for many child pornography defendants. Stabenow, T. (2009) Deconstructing the Myth of Careful Study: A Proposal for Reforming the Child Pornography Guidelines, 3. Multiple circuit courts of appeal and district courts have echoed the concerns expressed in Mr. Stabenow's articles.

This Court can and should decline the rote application of U.S.S.G. §2G2.2 because, it is based on outdated and disproportionate enhancements that result in an overly severe sentence in this case. The United States Sentencing Commission itself agrees. In a December, 2012, report to Congress[4][hereinafter referred to as "U.S.S.C. 2012 Report"] and again in a supplemental report in June, 2021,[5][hereinafter referred to as U.S.S.C. 2021 Report"] the United States Sentencing Commission, after much study and analysis, concluded that lockstep application of U.S.S.G. §2G2.2 is not reasonable because it leads to sentences that are "overly severe for some offenders". (U.S.S.C. 2012 Report, p. 323). The Sentencing Commission recognized that "[t]he current sentencing scheme in §2G2.2 places a disproportionate emphasis on outmoded measures of culpability regarding offenders' collections" and that "[a]s a result, the current sentencing scheme results in overly severe guideline ranges for some offenders based on outdated and disproportionate enhancements related to their collecting behavior." (Id., p. 321-23). The recommendations of the Commission in 2012 went unheeded by Congress, so U.S.S.G. 2G2.2 remains flawed.

> To date, Congress has not implemented the Commission's statutory or guideline recommendations. Therefore, §2G2.2 remains largely unchanged, with the

---

[4] United States Sentencing Commission "2012 Report to Congress: Federal Child Pornography Offenses [found at **https://www.ussc.gov/research/congressional-reports/2012-report-congress-federal-child-pornograpghy-offenses].**

[5] United States Sentencing Commission "Federal Sentencing of Child Pornography Non-Production Offenses" [found at **https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf].**

> guideline enhancements for non-production child pornography offenders at
> issue in the 2012 Child Pornography Report still in effect. As a result, judges
> have continued to sentence most non-production child pornography offenders
> below their guideline ranges, most often by imposing variances pursuant to 18
> U.S.C. § 3553(a).

(U.S.S.C. 2021 Report, p. 3).

The purpose of any sentencing guideline is to properly place a defendant's conduct within the "spectrum of offense behavior" for a given crime. (U.S.S.C. 2012 Report, p. 322- 23). U.S.S.G. §2G2.2 does not do this because it applies "to a majority of offenders" so-called special characteristics "based on the content of the typical offender's collection". Accordingly, the guideline "does not adequately distinguish among most offenders regarding their collecting behaviors". This results "in guideline ranges that are overly severe for some offenders in view of the nature of their collecting behavior". (Id., at pp. 322-23). For example, there is nothing "special" about images of prepubescent minors or sadistic conduct or computer use in the average non-production child pornography case. In the 2012 Report, the Commission reported that images of prepubescent minors are involved in 96.3% of cases, sado-masochistic portrayals in 74.2% and computer use in virtually every case. (U.S.S.C. 2012 Report, p.323 n. 58). **The 2021 Report found roughly the same thing— prepubescent** images in 99.4% of cases, sado-masochistic images in 84% of cases, and computer use **in 95% of cases**. (2021 U.S.S.C. Report, p. 4). Nevertheless, in calculating an advisory sentence, the Guidelines deem these characteristics to be somehow aggravators not present in the usual case and assign a total 8 level increase in offense level. U.S.S.G. §§2G2.2 (b)(2), (b)(4), and (b)(6). The 2021 report found the situation unchanged.

> The 2012 Child Pornography Report explained that by fiscal year 2010,
> four of the six enhancements in §2G2.2(b)—together accounting for 13
> offense levels—applied to the typical non-production child pornography
> offender and thus failed to meaningfully distinguish between more culpable
> and less culpable offenders.

In fiscal year 2019, these enhancements each continued to apply in the vast majority of non-production child pornography cases. Notably, over 95 percent of non-production child pornography offenders received enhancements for use of a computer and for the age of the victim (images depicting victims under the age of 12). The enhancements for images depicting sadistic or masochistic conduct or abuse of an infant or toddler (84.0% of cases) or having 600 or more images (77.2% of cases) were also applied in most cases.

. . . . Thus, across all non-production child pornography offense types, §2G2.2 fails to distinguish adequately between more and less severe offenders.

(U.S.S.C. 2021 Report, p. 19).

While the Eighth Circuit has not expressly adopted the position that the child pornography guidelines as a whole result in sentences that are "greater than necessary" to achieve the goals of sentencing, it has favorably cited related to such discussion in the Second Circuit:

In *United States v. Dorvee*, 604 F.3d 84, 96 (2d Cir. 2010), the Second Circuit provided an interesting discussion on the standard application of several § 2G2.2 enhancements in nearly all cases. While *Dorvee* did not specifically discuss distribution enhancements, it noted the typical enhancements, including several that applied to Durham here, result in a concentration of varying offenders at or near the statutory maximum, which diminishes the importance of the nature and circumstances of each offense and the history and characteristics of the defendant.

*United States v. Durham*, 618 F.3d 921, 931 n.7 (8th Cir. 2010). The discussion in *Dorvee* is indeed instructive and relevant to Mr. Montgomery's case:

The § 2G2.2 sentencing enhancements…routinely result in Guidelines projections near or exceeding the statutory maximum, even in run-of-the-mill cases. The base offense level for distribution of child pornography, which in 1991 was 13, has been gradually increased to 22 as the Commission has attempted to square the Guidelines with Congress's various directives. *See* United States Sentencing Commission, *The History of the Child Pornography Guidelines, supra,* at 19. On top of that, many of the § 2G2.2 enhancements apply in nearly all cases. Of all sentences under § 2G2.2 in 2009, 94.8% involved an image of a prepubescent minor (qualifying for a two-level increase pursuant to § 2G2.2(b)(2)), 97.2% involved a computer (qualifying for a two-level increase pursuant to § 2G2.2(b)(6)), 73.4% involved an image depicting sadistic or masochistic conduct or other forms of violence (qualifying for a four-level enhancement pursuant to §

> 2G2.2(b)(4)), and 63.1% involved 600 or more images (qualifying for a five-level enhancement pursuant to § 2G2.2(b)(7)(D))…In sum, these enhancements, which apply to the vast majority of defendants sentenced under § 2G2.2, add up to 13 levels, resulting in a typical total offense level of 35.

*United States v. Dorvee*, 604 F.3d 84, 96 (2d Cir. 2010) (Internal citations omitted).

As a matter of policy, the child pornography guidelines are simply too harsh; another district court within the Eighth Circuit has noted: "Under the Guidelines scheme, there is essentially no internet child pornography offender who could end up with a recommended sentence at the low end of the statutory range." *United States v. Howard*, No. 8:08CR387, 2010 U.S. Dist. LEXIS 17740, at *33 (D. Neb. Mar. 1, 2010). Mr. Montgomery's case is no exception.

Mr. Montgomery's base offense level of 22 was increased by thirteen levels based on the specific offense characteristics scored pursuant to the child pornography guidelines enumerated in the PSR paragraphs 19, 21, 22, and 23. This represents an increase from 41-51 months in prison to 168-210 months in prison, even without including the disputed enhancements not specific to child pornography cases enumerated in PSR paragraphs 20 and 25. This staggering increase in the recommended sentence is attributable to the following aggravating factors or "specific offense characteristics," none of which are based on empirical evidence.

### 1. Two-Level Increase for Images of Minors Who Had Not Attained the Age of Twelve and the Four-Level Increase for Sadistic and Masochistic Images

Mr. Montgomery's offense level is increased two-levels because the child pornography at issue contained images of minors who were prepubescent or had not attained the age of twelve. While the guidelines consider this an aggravating factor, in reality, it is the norm in these types of cases. The guidelines consider this an aggravating factor and increase Mr. Montgomery's recommended sentence by two levels for conduct that is the norm in these types of cases, and which has already been considered, at least in part, in the base offense level. For these reasons and

those set forth below, Mr. Montgomery respectfully requests a downward variance of at least two-levels to account for this unwarranted increase in his guideline range. Four Level Increase for Sadistic and Masochistic Images

Mr. Montgomery's guidelines are also increased by four levels because the images contained sadistic and masochistic images. Child pornography is sadistic and masochistic by definition. Again, this specific offense characteristic is already considered as part of the high base-offense level and mandatory minimum sentence. This four-level enhancement serves to raise Mr. Montgomery's Total Offense Level from 36 to 40, a difference of a staggering 104 months. Because such a dramatic increase is unwarranted, Mr. Montgomery respectfully requests a downward variance of four-levels.

### 2. Two-Level Increase for Using a Computer

The guidelines also call for a two-level increase because the offense involved the use of a computer. Given how ubiquitous computers are these days, this enhancement seems outdated and almost redundant. It would be the rare case where this enhancement did not apply to a child pornography case. As such, it can hardly be considered an "aggravating" factor anymore. As much as the Sentencing Commission may want to prevent/punish the spreading of these images through the use of a computer, the Commission cannot un-ring the bell. This specific offense characteristic is akin to having an enhancement for using a plane, train, or automobile to transport stolen property in interstate commerce. Because people use computers for virtually everything these days, this enhancement is outdated and should not be considered an aggravating factor, as it once might have been. The Sentencing Commission has failed to recognize this or revise this guideline accordingly. Therefore, Mr. Montgomery respectfully requests a downward variance of two-levels to account for this fact.

**D. The Need For The Sentence To Reflect The Seriousness Of The Offense, Promote Respect For The Law, And Provide Just Punishment**

Section 3553(a)(2)(A) requires the Court to consider "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." These sentencing objectives, set forth in section 3553(a)(2)(A) are generally referred to, collectively, as "retribution," which has been defined as follows:

> First, retributive, or "just desserts," theory considers only the defendant's past actions, not his or her probable future conduct or the effect that the punishment might have on crime rates or otherwise. Second, retribution examines the actor's degree of blameworthiness for his or her past actions, focusing on the offense being sentenced . . . Third, the degree of blameworthiness of an offense is generally assessed according to two kinds of elements: the nature and seriousness of the harm causes or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (*mens rea*) motives, role in the offense, and mental illness or other diminished capacity.

Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?* 89 Minn. L. Rev. 571, 590 (February 2005) (emphasis supplied).

Mr. Montgomery understands the seriousness of this offense, and that what he did was wrong. While this does not excuse his conduct, he has begun to atone for his actions by accepting responsibility for his actions and pleading guilty to a very serious federal felony.

**E. The Need For The Sentence To Adequately Deter Criminal Conduct**

Section 3553(a)(2)(B) requires the Court to consider "the need for the sentence imposed . . . to afford adequate deterrence to criminal activity. In debunking the myth that lengthy sentences have a deterrent effect, Amy Baron Evans, a leading scholar on federal sentencing, wrote:

> Indeed, while many believe that the higher the sentence, the greater the effect in deterring others, the empirical research shows no relationship between sentence length and deterrence. The general research finding is that "deterrence works," in the sense that there is less crime with a criminal justice system than there would be without one. But the question for the judge is "marginal deterrence," *i.e.*, whether

any particular quantum of punishment results in increased deterrence and thus decreased crime. Here the findings are uniformly negative: there is no evidence that increases in sentence length reduce crime through deterrence. "Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion as has every major survey of the evidence." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006).

Amy Baron Evans, Sentencing By the Statute, April 27, 2009, available at: http://www.fd.org/pdf_lib/. Thus, it appears there is no correlation between the length of the sentence and its deterrent effect. The most critical factor is that there is predictable accountability. Mr. Montgomery is being held accountable for his actions. He was contacted by law enforcement, and accepted responsibility for having committed a federal felony, for which a conviction carries numerous penalties in addition to incarceration, e.g., severe restrictions of one's liberty while on supervised release, the imposition of fines and costs, and sex offender registration, along with numerous collateral consequences. Thus, there is little reason, at least under this factor, to impose a sentence longer than the mandatory minimum of fifteen years to deter Mr. Montgomery, or others, from committing a similar crime.

**F.   The Need For The Sentence To Protect The Public From Further Crimes Of The Defendant**

Section 3553(a)(2)(C) requires the Court to consider "the need for the sentence imposed . . . to protect the public from further crimes of the defendant." The objective of this provision is to address the defendant's risk of recidivism and the danger posed by the defendant, if any.

Mr. Montgomery does not present a threat to the public. First, this is a non-violent offense. Second, to the extent that any threat of him re-offending exists, he is dedicated to receiving the counseling and treatments necessary. Third, this offense is Mr. Montgomery's first offense, and therefore, he is of the lowest recidivism risk. Additionally, through use of close supervision and monitoring of supervised release, any risk that Mr. Montgomery might pose can be adequately

addressed. Therefore, there is little reason to sentence him to a period of incarceration longer than five years based on this factor.

**G.  The Need For The Sentence To Provide The Defendant With Needed Vocational Training, Medical Care, Or Correctional Treatment**

To the extent that Mr. Montgomery is incarcerated, he is eager to avail himself of the educational and vocational courses and work assignments as he is driven to continuing to earn a living to support his family.

**H.  Other Kinds Of Sentences Available**

Pursuant to Section 3553(a)(3), the Court is to consider the kinds of sentences available. Under the statute, the Court can sentence Mr. Montgomery to anywhere between fifteen and thirty years in prison. Because the Guidelines are advisory, the Court is free to impose a sentence anywhere within that range so long as it is properly justified under 18 U.S.C. § 3553.

**I.  The Need For the Sentence To Avoid Unwarranted Disparities**

Section 3553(a)(6) requires the Court to consider at sentencing "the need to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct." This court need not worry that a below guideline sentence would result in an unwarranted disparity since Courts throughout the country have recognized the flaws of the child pornography guidelines in cases like Mr. Montgomery. Granting Mr. Montgomery's request for a downward variance does not invoke an unwarranted sentencing disparity among defendants. Doing so is reasonable and justifiable based on the nature of the offense and the circumstances of the defendant.

Furthermore, the defense submits that examining the respective sentences of Mr. Montgomery's co-defendants also supports a motion below the advisory guideline range in this matter.  Mr. Montgomery's conduct is less aggravating than the conduct of his two co-defendants.

For example, Mr. Valis calculated guideline range was 210 to 262 months. He received a sentence of 210 months. Mr. Valis did not receive a leadership enhancement. However, Mr. Valis routinely posted links to images depicting prepubescent minors, posted significantly more links than Mr. Montgomery, expressed interest in "hurtcore" pornography, possessed images of children involved in bondage and bestiality, admitted to taking steps to expose his penis to minors, and admitted to using alcohol to induce a minor with cognitive limitations to engage in sexual contact that included placing his hands and fingers in her groin area. DOC. 145, pp. 4-5. Mr. Valis actually assaulted a minor with impaired cognitive abilities. Mr. Howland received a sentence of 264 months. Mr. Howland was a higher-ranking member of the website than Mr. Montgomery and used spy cams to produce child sexually abusive material by surreptitiously taking photos of minors in his bathroom.

In contrast, there is no evidence that Mr. Montgomery has any contact with minors nor is there any allegations of any contact. Furthermore, Mr. Montgomery posted a minimal amount of links. As indicated, the stipulation of facts contained in the plea agreement, the first and only instance the government cites wherein Mr. Montgomery "advertised and shared child pornography over Website A" was on June 20, 2020. (Plea Agreement, R. 223, p. 3). Furthermore, the material shared by Mr. Montgomery was significantly less aggravating that the content shared by Mr. Valis and Mr. Howland. Finally, there is no evidence at all that Mr. Montgomery produced any original images. The same cannot be said for Defendant Howland.

The Defense submits that even with the 3-level manager enhancement for Mr. Montgomery's role in instructing other members to follows the rules of the site, Mr. Montgomery's activities ae the least aggravating of the three. The Defense submits that his sentence should reflect that fact.

## IV.   CONCLUSION

For the reasons stated above, Mr. Montgomery respectfully requests that the Court

sentence him to the mandatory minimum term of incarceration.

Respectfully submitted,

Dated: July 17, 2024
/s/ *Michael A. Bartish*
MICHAEL A. BARTISH
Attorney for Defendant
Michigan Attorney (P59726)
SBBL, PLLC
60 Monroe Center St., N.W., Suite 500
Grand Rapids, Michigan 49503
Tel: (616) 458-5500
mike@sbbllaw.com


Dated: July 17, 2024
Respectfully submitted,

/s/ Christopher M. Joseph
Christopher M. Joseph, #KS000508
Joseph, Hollander & Craft LLC
5200 Bob Billings Parkway, Suite 201
Lawrence, KS 66049
(785) 856-0143 Phone
(855) 955-1318 Fax
cjoseph@josephhollander.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2024, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send notice of electronic filing to all counsel of record.


/s/ Christopher M. Joseph
Christopher M. Joseph